UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KIARA GALLAGHER,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>GURSTEL, STALOCH & CHARGO, P.A.,<br><br>　　　　　　　Defendant. | Case No. 08-CV-1189 (PJS/RLE)<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT |

Samuel J. Glover, SAMUEL J. GLOVER & ASSOCIATES, LLC, for plaintiff.

Michael D. Johnson, GURSTEL, STALOCH & CHARGO, P.A., for defendant.

Plaintiff Kiara Gallagher brings this action against defendant Gurstel, Staloch & Chargo, P.A. ("Gurstel") under Minn. Stat. § 571.90 and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 et seq. This lawsuit arises out of errors made by Gallagher, Gallagher's bank, and Gurstel, which resulted in Gallagher's bank account being "over-garnished" by Gurstel. Gurstel has moved for summary judgment. For the reasons set forth below, Gurstel's motion is denied in almost all respects.

I. BACKGROUND

In May 2005, Gurstel sued Gallagher in state court to collect a $4,338.45 debt owed to a client of Gurstel's. Docket No. 24-2 at 8 ¶ 4. The parties agreed to settle the matter for $4,000.00. Docket No. 24-2 at 2 ¶ 11. Pursuant to the settlement, Gallagher signed a stipulation and confession of judgment under which she agreed to make a down payment of $2,000.00 and ten monthly payments of $200.00. Docket No. 24-3 at 8-9. The stipulation and judgment provided that if Gallagher defaulted on any of the payments, then Gurstel would be entitled to obtain a default judgment for the entire $4,338.45 debt, plus interest and service costs, but minus

any payments that Gallagher had already made. Docket No. 24-3 at 9. Gurstel could obtain the default judgment by serving and filing an affidavit of default. Docket No. 24-3 at 9.

Gallagher made the initial $2,000.00 payment and nine monthly payments of $200.00. Gallagher failed to make the tenth and final $200.00 payment, though, because she erroneously believed that she had made all the required payments. This was the first of four major errors that led to this lawsuit.

Gurstel sent Gallagher a letter informing her that her final payment was past due. Docket No. 24-3 at 11. Gallagher either did not receive this letter or chose to ignore it. After receiving no response from Gallagher, Gurstel proceeded to obtain a default judgment by filing an affidavit of default with the state court.

The affidavit accurately recited the original amount of the debt and Gallagher's $3,800.00 in payments. Docket No. 24-3 at 13. But the affidavit erroneously requested judgment in the amount of $5,215.38, which was the full amount of the original debt, plus interest and service costs. Docket No. 24-3 at 14. This was the second of four major errors that led to this lawsuit.

Gurstel claims that, when it filed the erroneous affidavit of default with the state court, it simultaneously filed two other documents that properly credited Gallagher's $3,800.00 in payments: an "affidavit of identification" and a proposed order. Johnson Aff. ¶ 7. But Gurstel did not serve either of these documents on Gallagher, *see* Docket No. 24-3 at 12-14, and neither of these documents appears in the record of this case. There is no dispute, though, that the default judgment that Gurstel actually obtained from the state court — a judgment for $2,139.08 — properly excluded the $3,800.00 that Gallagher had already paid on the debt.

After obtaining the default judgment, Gurstel sent two garnishment summonses to Wells Fargo Bank, where Gallagher had an account. *See* Docket No. 24-3 at 17-18; Docket No. 24-4 at

2-3. It was odd for Gurstel to send two summonses for a single debt, and even odder to send both summonses on the same day. The summonses bore the same state-court file number and date of underlying judgment, but inexplicably contained two different claim amounts. The first summons identified the unpaid balance of Gurstel's claim as $2,139.66. Docket No. 24-3 at 17. The second summons identified the unpaid balance of Gurstel's claim as $1,908.94. Docket No. 24-4 at 2. This was the third of four major errors that led to this lawsuit.

Wells Fargo treated the summonses as though each related to a separate debt and garnished a total of $4,153.36 — all of the money in Gallagher's account, and roughly double the actual amount of Gurstel's claim.[1] Docket No. 24-3 at 15. When Gallagher discovered that all of the funds in her account had been frozen, she contacted Wells Fargo, who told her to contact Gurstel. Gallagher called Gurstel and spoke with Charlynn Garcia, an employee of Gurstel. Gallagher told Garcia that the bank was holding over $4,000.00 and asked how that could be legal. Docket No. 24-2 at 4. Garcia responded that the bank had told Gurstel that it was holding only $2,353.63. Garcia Aff. ¶ 5. Gallagher alleges that Garcia laughed "cruelly" during this call, a claim that Garcia denies. Docket No. 24-2 at 4; Garcia Aff. ¶¶ 10-11.

After Gallagher's phone call, Garcia asked Kim Handschke, a paralegal at Gurstel, to investigate how much money Wells Fargo had in fact garnished. Garcia Aff. ¶ 7; Handschke Aff. ¶ 3. Handschke contacted Wells Fargo, and Wells Fargo sent Gurstel a disclosure form stating

---

[1]This amount represents 110% of the $2,139.66 claimed in the first summons ($2,353.63), a $75.00 bank fee, and $1,724.73, which was the remaining amount left unfrozen in Gallagher's account after the first garnishment. *See* Docket No. 24-3 at 15-16; Minn. Stat. § 571.73, subd. 1 (service of a garnishment summons requires garnishee to retain no more than 110% of the amount of the claim).

that only $2,353.63 was being held. Handschke Aff. Ex. A. This made it appear that Gallagher had been lying. This was the fourth of four major errors that led to this lawsuit.

A few days later, Gallagher again called Garcia, again claimed that Wells Fargo had frozen over $4,000.00, and again asked that Gurstel release the money in her account. Garcia refused to do so, because, based on what Wells Fargo had told Gurstel, Garcia believed that the bank was holding only the $2,353.63 to which Gurstel was entitled. Johnson Aff. Ex. C. Gallagher, of course, knew that this was not true.

A few weeks later, Gallagher filed a motion in state court to vacate the judgment and quash the garnishment. After receiving Gallagher's motion, Gurstel contacted Wells Fargo and learned that the second garnishment had frozen an additional $1,724.73. Gurstel immediately released the excess funds to Gallagher and offered to reimburse Gallagher for any overdraft fees that she incurred as a result of the second garnishment. Johnson Aff. ¶¶ 9-10. Gallagher then filed this lawsuit.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences

that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. Gallagher's Claims

Gallagher alleges that Gurstel violated the FDCPA in three ways: first, by treating her abusively during the first phone call; second, by serving an erroneous affidavit of default; and third, by garnishing more than the amount to which it was entitled. Gallagher also claims that the excessive garnishment violated Minnesota state law. The Court considers each claim in turn.

#### 1. Telephone Call

The FDCPA prohibits debt collectors from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Gallagher alleges that Gurstel violated this provision when one of its employees (Garcia) laughed at her.

"[A]lthough the question of 'whether conduct harasses, oppresses, or abuses will [ordinarily] be a question for the jury, . . . Congress has indicated its desire for the courts to structure the confines of § 1692d.'" *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330 (6th Cir. 2006) (quoting *Jeter v. Credit Bureau*, 760 F.2d 1168, 1179 (11th Cir. 1985) (second alteration in original)). If a creditor's alleged acts do not have the natural consequence of harassing, oppressing, or abusing a debtor, courts will dismiss the claim. *Id.*

In this case, Gallagher complains of a single laugh during a single phone call that involved only Gallagher and Garcia and that was initiated by Gallagher. Gallagher identifies no other conduct — no profanities, no name calling, no insults, no unwanted calls, no disclosure of private information to third parties, nothing — that could reasonably be deemed harassing, oppressive, or abusive.

Garcia's laugh is not remotely comparable to the type of conduct that has been found to give rise to liability under § 1692d.  *See, e.g.*, *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 773-74 (7th Cir. 2003) (finding § 1692d violation where defendant, who had been told not to call plaintiff at work, called plaintiff's coworker and said "tell Amanda to stop being such a [expletive] bitch"); *Sanchez v. Client Servs., Inc.*, 520 F. Supp. 2d 1149, 1160-61 (N.D. Cal. 2007) (finding § 1692d violation where defendants called plaintiff's workplace fifty-four times over the course of several months, including multiple calls on the same day).  Section 1692d is meant to provide a remedy for harassment, oppression, and abuse, not for bad manners.  The Court therefore grants Gurstel's motion on Gallagher's § 1692d claim.

## 2. Affidavit of Default

The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.  The FDCPA also prohibits the use of "unfair or unconscionable means" to collect any debt.  15 U.S.C. § 1692f.  Gallagher alleges that Gurstel violated both of these provisions when it served her with the affidavit of default seeking a judgment of $5,215.38, an amount that erroneously failed to credit Gallagher with the $3,800.00 in payments that she had already made.

In determining whether a debt-collection communication was false, deceptive, misleading, unfair, or unconscionable, the communication must be viewed through the eyes of an unsophisticated consumer.  *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317-318 (8th Cir. 2004); *Peters v. Gen. Serv. Bureau, Inc.*, 277 F.3d 1051, 1055 (8th Cir. 2002).  Having examined the affidavit of default, the Court believes that a jury will have to decide whether it was misleading.  Even a sophisticated consumer would have understood Gurstel's demand for $5,215.38 to be a representation that Gallagher owed that amount, and there is no dispute that

Gallagher did not, in fact, owe that amount. The demand must be read in the context of the entire affidavit, of course, but a reasonable jury could nevertheless find that the demand for $5,215.38 would have misled an unsophisticated consumer.

Gurstel argues that the affidavit is not misleading because it was filed in state court simultaneously with two other documents that correctly stated the amount of the judgment to which Gurstel was entitled. But Gurstel did not serve those documents on Gallagher, nor are they in the record. Whether or not the additional documents rendered the affidavit of default not misleading is thus both irrelevant (as a debtor cannot be expected to know the contents of documents that were not provided to her) and impossible for the Court to determine (as those documents are not in the record). The Court therefore denies Gurstel's motion on this claim to the extent that it rests on the argument that, as a matter of law, the affidavit of default served on Gallagher was not misleading.

### 3. Garnishments

As described above, Gurstel sent two garnishment summonses on the same day to Wells Fargo. In response, Wells Fargo garnished a total of $4,153.36 in Gallagher's account — almost double the amount of Gurstel's actual claim. Gallagher alleges that Gurstel violated Minn. Stat. § 571.72 and various provisions of the FDCPA when it garnished more than the amount to which it was entitled. Specifically, Gallagher alleges that Gurstel violated 15 U.S.C. §§ 1692e(2), 1692e(5), 1692e(10), 1692f(1), 1692f(5), and 1692f(6).

As a result of Gallagher's scattershot approach to pleading this claim, the parties did not adequately address any of these individual provisions in their briefs. At oral argument, though, Gallagher focused on §§ 1692f(1) and 1692f(6), abandoning, at least implicitly, her claims under the other provisions. The Court will likewise focus on §§ 1692f(1) and 1692f(6).

Section 1692f(6) does not apply to the facts of this case. Section 1692f(6) prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property" in three circumstances: (1) when "there is no present right to possession of the property claimed as collateral through an enforceable security interest"; (2) when "there is no present intention to take possession of the property"; or (3) when "the property is exempt by law from such dispossession or disablement."

Section 1692f(6) would not seem to apply to Gurstel's service of two garnishment summonses on Wells Fargo, as serving a garnishment summons is presumably not a "nonjudicial action." Minnesota law authorizes the service of a garnishment summons only "[a]s an ancillary proceeding to a civil action for the recovery of money," Minn. Stat. § 571.71, and "[t]o enforce a claim asserted in a civil action venued in a court of record," Minn. Stat. § 571.72, subd. 2. In other words, the service of a garnishment summons essentially commences an ancillary judicial proceeding. Thus a creditor who serves a garnishment summons would appear to be taking a judicial action, not a "nonjudicial action." The Court is not certain, though, as the Court has been unable to find — and the parties have been unable to cite — any judicial decision that squarely addresses this issue under § 1692f(6).

In any event, even if serving a garnishment summons is a "nonjudicial action," the first two circumstances listed in § 1692f(6) are clearly inapplicable to this case. There is no "property claimed as collateral through an enforceable security interest," as described by the first subsection, nor is there an empty threat of the type described by the second subsection. The only conceivable basis for invoking § 1692f(6) would be if Gurstel had effected dispossession or disablement of funds that are "exempt by law from such dispossession or disablement," as described by the third subsection.

Gallagher has not attempted to explain how the facts of this case fit within this language. To say that property is exempt by law presupposes that, absent an exemption created by law, the debt collector would have a right to dispossess or disable the property. That is clearly not what Gallagher is alleging. Her claim is not that Gurstel froze funds to which it would be entitled but for an exemption created by law; her claim is that Gurstel froze funds to which it was never entitled, period. *Cf. Larranaga v. Mile High Collection & Recovery Bureau, Inc.*, 807 F. Supp. 111, 112-13 (D.N.M. 1992) (holding that repossessor's incidental taking of personal property in repossessed car did not violate § 1692f(6) because the personal property was neither "property claimed as collateral through an enforceable security interest" nor subject to any legal exemption). Thus, Gallagher has not made out a violation of § 1692f(6).

Gallagher's § 1692f(1) claim is closely related to her claim that Gurstel violated Minn. Stat. § 571.72. Section 1692f(1) prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Although § 1692f(1) by its terms prohibits only the *collection* of amounts to which the defendant is not entitled, the Eighth Circuit has found a § 1692f(1) violation where the defendants merely *attempted* to collect more than the amount to which they were entitled. *Duffy v. Landberg*, 215 F.3d 871, 873-75 (8th Cir. 2000) (finding that three demand letters that overstated interest calculations by $1.29, $1.84, and $.65, respectively, violated the plain language of § 1692f(1)).

Minnesota garnishment procedures are set out in Minn. Stat. §§ 571.71 et seq. Under Minn. Stat. § 571.72, a garnishment summons is required to state, among other things, "the amount of the claim that remains unpaid," § 571.72, subd. 2(1), and that "the garnishee shall retain disposable earnings, indebtedness, money, or property of the debtor in the garnishee's

possession or under the garnishee's control not in excess of 110 percent of the amount of the claim that remains unpaid," § 571.72, subd. 2(5). Once a summons is served, a garnishee must retain possession and control of the debtor's property up to 110% of the amount claimed in the summons. Minn. Stat. § 571.73, subd. 1. But a garnishment summons freezes only assets that are in the hands of the garnishee at the time the summons is served. *Ceridian Corp. v. SCSC Corp.*, 212 F.3d 398, 405 (8th Cir. 2000). For example, if a garnishment summons claiming an entitlement to $1000.00 is served on a bank on March 1, and the debtor's account at that bank contains only $2.00 on March 1, then the garnishment summons freezes only $2.00. If, on March 2, the debtor deposits $500.00 into her bank account, the garnishment summons served on March 1 will not freeze any portion of that $500.00 deposit. If the creditor wants to reach it, the creditor must serve another summons. For this reason, multiple garnishment summonses are permissible when the property sought to be garnished is fluid property, such as a bank account. *Id.*

Gurstel argues that the two garnishment summonses that it served on Wells Fargo complied with § 571.72 because they accurately stated that the bank should freeze no more than 110% of the amount of Gurstel's claim. For this reason, and because it is not illegal to issue multiple garnishment summonses, Gurstel argues that it violated neither Minnesota law nor the FDCPA.

Under the facts of this case, however, a reasonable jury could find that Gurstel misrepresented the amount of its claim in the garnishment summonses. As noted, Minnesota law requires that a garnishment summons state "the amount of the claim that remains unpaid . . . ." Minn. Stat. § 571.72, subd. 2(1). The statute does not explicitly require that the garnishment summons accurately or truthfully state the amount of the claim that remains unpaid, but this, of

course, is implicit. Indeed, Gurstel concedes that "issuing a single garnishment for more than the judgment amount would violate Minnesota law." Docket No. 31.

In this case, Gurstel did something quite unusual — something that apparently misled Wells Fargo into believing that the amount of Gurstel's unpaid claim was larger than it really was: Gurstel issued two garnishment summonses on the same day for two different amounts. The first summons stated that the amount of Gurstel's unpaid claim was $2,139.66, which is $0.58 more than the amount of its actual claim.[2] In response to this first summons, Wells Fargo froze $2,353.53, which is 110% of $2,139.66. The second summons stated that the amount of Gurstel's unpaid claim was $1,908.94. In response to this second summons, Wells Fargo froze the remaining funds in Gallagher's account.

At oral argument, Gurstel was at a loss to explain why it issued two garnishment summonses in two different amounts on the same day. Presumably, it would be possible for a creditor to issue a garnishment summons in the amount of its claim, the debtor then to pay off some amount of that claim, and the creditor then to issue a second garnishment summons reflecting the reduced claim. But nothing like that happened here. Instead, Gurstel issued both of the summonses on the same day, without any intervening payment from Gallagher. At the time the second summons was issued, the first summons had already resulted in the garnishment of the full amount to which Gurstel was entitled. A reasonable jury could find that, by issuing the second summons on the same day for a different amount after the first summons had already resulted in the garnishment of the full amount to which it was entitled, Gurstel was

---

[2]This error, which Gurstel attributes to a clerical mistake, would appear to be enough by itself to violate the FDCPA's prohibition on collection of amounts not permitted by law. *See Duffy*, 215 F.3d at 873-75.

communicating to Wells Fargo (whether inadvertently or not) that it had two different claims (or that it had one claim that was the sum of the two different amounts). And if, in this manner, Gurstel misrepresented the amount of its claim to Wells Fargo, it violated Minn. Stat. § 571.72, subd. 2(1) (requiring the garnishment summons to accurately state the amount of the unpaid claim), and it independently violated 15 U.S.C. § 1692f(1) (which prohibits the collection of amounts not expressly authorized by the agreement creating the debt or permitted by law).

Minnesota law provides a remedy for bad-faith violations of state garnishment law. *See* Minn. Stat. § 571.90. Given that Gurstel could not explain why it issued two garnishment summonses on the same day for two different amounts, the Court finds that there is an issue of fact concerning whether any violation of Minn. Stat. § 571.72 was in bad faith. The Court therefore denies Gurstel's motion to the extent that it rests on the argument that its service of the garnishment summonses did not violate either state or federal law.

### C. Gurstel's Affirmative Defenses[3]

#### 1. Bona Fide Error

Gurstel argues that, even if it violated the FDCPA, it should be excused from liability under 15 U.S.C. § 1692k(c). Section 1692k(c) creates an exception to FDCPA liability for unintentional violations that "resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." To prevail on this affirmative defense, "a debt collector must prove by a preponderance of the evidence that its FDCPA violation was

---

[3]In its briefing, Gurstel argued that Gallagher's claims are barred by the *Rooker-Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923). At oral argument, though, Gurstel withdrew this argument, citing *MSK EyEs Ltd. v. Wells Fargo Bank, National Ass'n*, 546 F.3d 533, 538-39 (8th Cir. 2008) (holding that the *Rooker-Feldman* doctrine did not bar state-law claims arising out of the defendant's actions in enforcing a judgment).

unintentional and was caused by an objectively bona fide error (i.e., one that is plausible and reasonable) made despite the use of procedures reasonably adapted to prevent that specific error." *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 420 (8th Cir. 2008).

With respect to the allegedly misleading affidavit of default, Gurstel provides no evidence of "the maintenance of procedures reasonably adapted to avoid any such error" except to argue that "Defendant's paralegals are diligently trained to include any payments on an account when drafting an affidavit of default." Johnson Aff. ¶ 13. But Gurstel has not provided any description of its training methods or any documentation supporting its claim that it diligently trains its paralegals. And certainly, nothing in the record before the Court — a record that reflects multiple unexplained errors committed by Gurstel paralegals — provides evidence that Gurstel's paralegals are diligently trained. In the absence of more specific information, the Court cannot determine whether Gurstel's procedures are reasonably adapted to prevent the error that occurred in this case. That is for the jury to decide.

With respect to Gallagher's claim that Gurstel garnished more than the amount to which it was entitled, the Court likewise concludes that whether Gurstel may prevail on a bona fide error defense is a jury issue. As noted earlier, Gurstel simply has no explanation for why it sent two garnishment summonses on the same day for two different amounts (neither of which was the correct amount of its claim). The Court can hardly grant summary judgment under § 1692k(c) to a defendant that literally cannot explain why it may have violated the FDCPA. Moreover, Gurstel has provided no evidence that it maintained "procedures reasonably adapted to avoid any such error" — save, again, the cursory assertion that the paralegals who made these errors were diligently trained to avoid them. Gurstel's motion is therefore denied to the extent that it rests on the argument that any violation of the FDCPA was the result of bona fide error.

2. Litigation Privilege

Finally, Gurstel argues that Gallagher's claims are barred by a litigation privilege. Gurstel relies primarily on state-court cases in which, Gurstel argues, courts have held that a litigation privilege barred similar claims. *See Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380 (Fla. 2007); *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606 (Fla. 1994). But these cases concern the scope of state-law privileges as applied to state-law causes of action, and thus these cases are irrelevant to Gallagher's FDCPA claims. Obviously a state cannot "privilege" a debt collector to violate federal law. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998) ("A state absolute litigation privilege purporting to confer immunity from suit cannot defeat a federal cause of action."); *Pescatrice v. Orovitz*, 539 F. Supp. 2d 1375, 1380 n.4 (S.D. Fla. 2008) ("To the extent Defendants argue that this proposed settlement offer is protected by a state 'absolute litigation privilege' for statements made during litigation, that privilege would only apply to state court claims, and not the FDCPA.").

As a general matter, persons who are integral parts of the judicial process, such as counsel and witnesses, have absolute immunity under federal common law from liability arising out of the performance of their official duties. *See Briscoe v. LaHue*, 460 U.S. 325, 334-36 (1983). But in *Heintz v. Jenkins*, the Supreme Court held that the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation." 514 U.S. 291, 299 (1995). The Court pointed to "two rather strong reasons for believing that the Act applies to the litigating activities of lawyers": First, an attorney's attempt to collect a debt through legal proceedings falls within the plain language of the statute. *Id.* at 294. Second, the FDCPA as originally enacted had largely exempted attorneys from its

coverage, but Congress repealed that exemption without replacing it with any narrower, litigation-related exemption. *Id.* at 294-95. In light of the plain language of the statute and its legislative history, the Court declined to read into the FDCPA an implied exemption for debt collection through litigation. *Id.* at 295-99.

After *Heintz*, most courts to consider the issue have held that common-law immunity for the litigation-related activities of counsel does not overcome the plain language of the FDCPA. *See Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 230 (4th Cir. 2007) ("The statutory text makes clear that there is no blanket common law litigation immunity from the requirements of the FDCPA."); *Gionis v. Javitch, Block, Rathbone, LLP*, 238 Fed. Appx. 24, 26-27 (6th Cir. 2007) (no immunity against FDCPA claims based on allegedly misleading affidavit attached to state-court complaint); *Phillips v. Messerli & Kramer, P.A.*, No. 08-4419, 2008 WL 5050127, at *10 (D. Minn. Nov. 20, 2008) ("claims that an attorney has violated the FDCPA do not implicate the litigation privilege"); *Nutter v. Messerli & Kramer, P.A.*, 500 F. Supp. 2d 1219, 1223-24 (D. Minn. 2007) (litigation privilege did not bar claim based on alleged misrepresentation in affidavit filed in state court); *Eads v. Wolpoff & Abramson, LLP*, 538 F. Supp. 2d 981, 987 n.7 (W.D. Tex. 2008) (stating, in dicta, that "[e]ven if Eads had premised Wolpoff's [FDCPA] liability upon the state court pleadings, Wolpoff is not entitled to immunity"); *Jenkins v. Gen. Collection Co.*, 538 F. Supp. 2d 1165, 1172 (D. Neb. 2008) ("In amending the FDCPA in 1986, Congress effectively withdrew common-law litigation immunity for lawyers who regularly engage in consumer-debt-collection activity through litigation."); *Reyes v. Kenosian & Miele, LLP*, No. C07-00253, 2008 WL 171070, at *5 (N.D. Cal. Jan. 18, 2008) ("Given the broad language in *Heintz*, the weight of authority applying the FDCPA to the contents of state court complaints, and an absence of controlling authority or statutory language to the contrary, the Court therefore

rejects Defendants' contention that the FDCPA does not, as a matter of law, ever apply to state court complaints."); *Parkis v. Arrow Fin. Servs., LLS*, No. 07-C-410, 2008 WL 94798, at *8 (N.D. Ill. Jan. 8, 2008) (holding that litigation privilege did not bar FDCPA claim premised on defendant's filing of time-barred debt-collection lawsuit); *Mello v. Great Seneca Fin. Corp.*, 526 F. Supp. 2d 1020, 1023 (C.D. Cal. 2007) (noting that the argument that attorneys are entitled to immunity from FDCPA claims for litigation-related activities "has been soundly rejected by courts").

As many courts have recognized, permitting common-law immunity to defeat an FDCPA claim is inconsistent with *Heintz*, which held that Congress intended to regulate lawyers' debt-collection activities even when those activities relate to litigation. Moreover, as some courts have noted, after *Heintz* Congress amended the FDCPA to exempt formal pleadings from the requirement that an initial written communication with a consumer notify the consumer that the debt collector is attempting to collect a debt. *See* 15 U.S.C. § 1692e(11); *Sayyed*, 485 F.3d at 231. As *Sayyed* points out, such an exemption would be unnecessary if formal pleadings were already exempt from the reach of the FDCPA by virtue of a common-law privilege. *Id.* In addition, the creation of such a limited statutory exemption counsels against the application of a broader common-law immunity to the comprehensive scheme embodied in the FDCPA. *Id.* at 233. Finally, the application of a common-law privilege is unwarranted because the FDCPA already contains a qualified privilege in the form of the bona fide error defense. *See* 15 U.S.C. § 1692k(c). For all of these reasons, courts have almost uniformly rejected the argument that federal common law immunizes lawyers' conduct in debt-collection litigation from the reach of the FDCPA.

Although the Eighth Circuit has not expressly addressed the issue of immunity in the context of the FDCPA, it is worth noting that the Eighth Circuit has found FDCPA violations on the basis of lawyers' conduct during litigation. *See Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001) (finding FDCPA violation where law firm's use of Minnesota's prejudgment garnishment procedure during a lawsuit was invalid under Minnesota law). The Court therefore concludes that Gallagher's FDCPA claims are not barred by any common-law immunity or common-law privilege applicable to lawyers' litigation activities.

The Court comes to the same conclusion with respect to Gallagher's state-law claim. Section 571.90 explicitly permits a debtor to recover statutory and actual damages for "[a]ny action by a creditor made in bad faith and in violation of [Chapter 571] . . . ." Section 571.71, which is entitled "Garnishment; when authorized," authorizes a "creditor" to issue a garnishment summons "[a]s an ancillary proceeding to a civil action for the recovery of money" in three instances, each of which is explicitly tied to "a civil action." Similarly, § 571.72 authorizes a "creditor" to serve a garnishment summons only "[t]o enforce a claim asserted in a civil action venued in a court of record . . . ." "Creditor" is defined for purposes of both § 571.71 and § 571.72 as "the party who has a claim for the recovery of money in the civil action . . . and who is issuing or requesting the issuance of a garnishment summons." Minn. Stat. § 571.712, subd. 2(a). In short, Minnesota law authorizes garnishment *only* by litigants and *only* in connection with civil litigation. If, then, litigators were protected by a common-law litigation privilege from being held liable for a bad-faith violation of the garnishment statutes in the course of litigation, § 571.90 would be largely eviscerated.

It is difficult to believe that Minnesota law provides remedies for bad-faith violations of the garnishment statute and then turns around and exempts most garnishments from those

remedies. The Court therefore concludes that Minnesota common law does not provide a litigation privilege that permits a debt collector to violate § 571.71 or § 571.72 with impunity.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment [Docket No. 13] is GRANTED IN PART and DENIED IN PART.

2. Defendant's motion is GRANTED with respect to plaintiff's claim that defendant violated 15 U.S.C. § 1692d by engaging in harassing, oppressive, and abusive conduct during a telephone call, and that claim is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Defendant's motion is DENIED in all other respects.

Dated: July 29, 2009         s/Patrick J. Schiltz
                             Patrick J. Schiltz
                             United States District Judge